FILED

JUL 1 4 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CACI INTERNATIONAL, et al.,       )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )     1:08cv249 (LMB/TRJ)
                                  )
ST. PAUL FIRE AND MARINE          )
INSURANCE COMPANY,                )
                                  )
          Defendant.              )

MEMORANDUM OPINION

Plaintiffs CACI International, Inc., CACI Inc. - Federal,
CACI Premier Technology, Inc., and CACI N.V. (collectively
"CACI") filed this declaratory judgment action against defendant
St. Paul Fire and Marine Insurance Company ("St. Paul"), seeking
a declaration that, under its general commercial insurance
policy, St. Paul is obligated to defend CACI in two pending
lawsuits brought by Iraqi nationals claiming that they were
abused and tortured by CACI employees.  St. Paul has denied any
duty to defend or indemnify CACI, arguing that the insurance
policy expressly denies coverage for the conduct alleged in those
lawsuits.

The parties have filed cross motions for summary judgment on
the issue of St. Paul's duty to defend.  For the reasons stated
below, CACI's motion for summary judgment will be denied and St.
Paul's motion for summary judgment will be granted.

Background

CACI, a Delaware company with its principal place of

business in Virginia, provides logistical, engineering, technological, and professional support to the United States government.  St. Paul, a Minnesota corporation with its principal place of business in Minnesota, provides property and casualty insurance to individuals and businesses.

On March 31, 2003, St. Paul issued a twelve month "Commercial General Liability Protection" policy to CACI. Coverage was capped at $1 million for each event, and $2 million for all claims.  See Coverage Summary, Policy No. TE09001851, March 31, 2003.  The policy also obligated St. Paul to defend CACI against any claim or suit for covered injury or damage.  See Commercial General Liability Protection, at 3, Policy No. TE09001851, March 31, 2003.  On March 31, 2004, CACI renewed the policy for an additional twelve months.  The scope of coverage was not changed.  See Coverage Summary, Policy No. TE09002030, March 31, 2004.  The provisions of the two policies are identical in all material respects.

In May 2003, CACI acquired the assets of Premier Technology Group, Inc., a company specializing in the provision of intelligence support and information technology to the United States government.  See Billings Decl. ¶¶ 5,7.  The company became a wholly-owned subsidiary of CACI and was renamed CACI Premier Technology, Inc. ("CACI Premier").  Id. ¶ 7.

Pursuant to two contracts issued in August 2003, CACI

-2-

Premier agreed to provide interrogators and screeners to assist with military intelligence operations in Iraq. Id. ¶ 10. A third contract was awarded in December 2003. Id. Under these contracts, interrogators and screeners were deployed to various locations in Iraq, including the Abu Ghraib prison. Id. ¶ 11.

In late April 2004, the news media began airing reports of detainee abuse at the Abu Ghraib prison. On May 10, 2004, CACI notified its insurance broker of its potential involvement in the detainee abuse. See Stewart Decl. ¶ 6. On May 13, 2004, this information was relayed to St. Paul. Id. ¶ 7.

On June 9, 2004, a group of former detainees alleging abuse by CACI employees at the Abu Ghraib prison and the Buka prison filed a class-action suit against CACI and its subsidiaries in the United States District Court for the Southern District of California.[1] In their complaint, plaintiffs allege that CACI interrogators committed numerous acts of abuse, including spraying naked detainees with cold water during the winter months, tying their hands behind their backs and leaving them naked on the floor, sometimes in the presence of dogs, and ordering them to stand naked in a room with the opposite sex. Plaintiffs also allege that CACI interrogators placed detainees outside during the summer months with their hands tied behind their backs; hit detainees with electric cables and stun guns;

---

[1] Titan Corporation was also named as a defendant.

-3-

electrocuted detainees' penises, anuses, and tongues; sodomized detainees with sticks; forced detainees to masturbate and engage in sexual acts; kicked and hit detainees on their heads, backs, stomachs, and genitals; placed hoods over detainees for extended periods of time, causing them to become disorientated and suffer breathing problems; placed flexi-cuffs around detainees' wrists for extended periods of time, causing skin lesions; deprived detainees of food, water, and sleep; forced detainees to stand in stress positions - hands above head, standing on one leg, crouching, etc. - for hours or days; hung detainees from the ceiling by their hands; and threatened to kill members of detainees' families. See Complaint, Al Rawi v. Titan Corp., No. 04-1143 (S.D. Cal. June 9, 2004) ("the Saleh complaint"). The civil action was transferred to this district pursuant to 28 U.S.C. § 1404, see Saleh v. Titan Corp., 361 F. Supp.2d 1152 (S.D. Cal. 2005), and finally to the United States District Court for the District of Columbia. See Order [61], Al Rawi v. Titan Corp., No. 05-427 (E.D. Va. Jan. 13, 2006).

On July 27, 2004, another group of plaintiffs - seven Iraqi nationals alleging that they or their late husbands had been abused at Abu Ghraib - filed a similar complaint in the United States District Court for the District of Columbia. See Complaint, Ibrahim v. Titan Corp., No. 04-1248 (D.D.C. July 27, 2004) ("the Ibrahim complaint"). In that complaint, the

-4-

plaintiffs allege that

> defendants and/or their agents tortured one or more of
> them by: beating them; depriving them of food and
> water; subjecting them to long periods of excessive
> noise; forcing them to be naked for prolonged periods;
> holding a pistol (which turned out to be unloaded) to
> the head of one of them and pulling the trigger;
> threatening to attack them with dogs; exposing them to
> cold for prolonged periods; urinating on them;
> depriving them of sleep; making them listen to loud
> music; photographing them while naked; forcing them to
> witness the abuse of other prisoners, including rape,
> sexual abuse, beatings and attacks by dogs; gouging out
> an eye; breaking a leg; electrocuting one of them;
> spearing one of them; forcing one of them to wear
> women's underwear over his head; having women soldiers
> order one of them to take off his clothes and then
> beating him when he refused to do so; forbidding one of
> them to pray, withholding food during Ramadan, and
> otherwise ridiculing and mistreating him for his
> religious beliefs; and falsely telling one of them that
> his family members had been killed.

Ibrahim v. Titan Corp., 391 F. Supp.2d 10, 12-13 (D.D.C. 2005).[2]

On June 10, 2004 and August 9, 2004, St. Paul received
notice of the complaints. See Stewart Decl. ¶¶ 9-10. In a
reservation of rights letter dated November 3, 2004, St. Paul
concluded that its insurance policy with CACI did not cover the
activities alleged in the two complaints, and it declined to pay
for CACI's defense to the litigation. See Morse Decl. ¶¶ 18-19.
St. Paul also filed a declaratory judgment action, asserting that
it had no duty to defend or indemnify CACI or its subsidiaries in

---

[2] Both Saleh and Ibrahim were assigned to Judge James
Robertson, who has consolidated discovery proceedings in the two
cases. See Saleh v. Titan Corp., 436 F. Supp.2d 55, 60 (D.D.C.
2006).

connection with the lawsuits.  <u>See</u> Complaint, <u>St. Paul Fire v.</u>
<u>CACI International</u>, No. 04-1336 (E.D. Va. Nov. 3, 2004).

Pursuant to a tolling agreement, St. Paul voluntarily
dismissed its declaratory judgment action without prejudice to
await the outcome of CACI's motion for summary judgment.  <u>See</u>
Morse Decl. ¶¶ 21-22.  On November 6, 2007, Judge Robertson
denied CACI's motion.  <u>See Ibrahim v. Titan Corp</u>., Nos. 04-1248,
05-1165, 2007 WL 3274784 (D.D.C. Nov. 6, 2007).

On March 14, 2008, CACI filed the instant declaratory
judgment action against St. Paul, seeking a declaration that St.
Paul is obligated to defend CACI in the two lawsuits.  St. Paul
filed a counterclaim requesting a contrary declaration that St.
Paul has no duty either to defend or indemnify CACI under the
terms of the insurance policy.

Standard of Review

Summary judgment is appropriate if there is no genuine issue
as to any material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1985).  In ruling on a
motion for summary judgment, a court should accept the evidence
of the non-moving party, and all justifiable inferences must be
drawn in that party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 255 (1986).

-6-

<u>Discussion</u>

In Virginia, an insurer's duty to defend "arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." <u>Lerner v. General Ins. Co. of Am.</u>, 245 S.E.2d 249, 251 (Va. 1978). "This rule, sometimes referred to as the Eight Corners Rule, requires a court to compare the four corners of the insurance policy against the four corners of the underlying complaint; if any allegations may potentially be covered by the policy, the insurer has a duty to defend." <u>Capital Envtl. Servs., Inc. v. North River Ins. Co.</u>, 536 F. Supp.2d 633, 640 (E.D. Va. 2008).

The parties raise numerous issues in support of their respective motions. St. Paul first argues that the alleged abuses by CACI interrogators – assault, electrocution, deprivation of food, etc. – are knowing and intentional acts, and that intentional acts fall outside of the insurance policy's coverage.[3] In response, CACI concedes that many of the alleged acts are intentional, but it argues that the complaints also permit proof that some of the detainees' injuries were caused by negligent conduct. Because injury resulting from negligence is

_____

[3] <u>See, e.g.</u>, Commercial General Liability Protection, at 16, Policy No. TE09001851, March 31, 2003 ("We won't cover bodily injury or property damage that's expected or intended by the protected person. Nor will we cover medical expenses that result from such bodily injury.").

expressly covered by the policy, CACI insists that St. Paul's duty to defend is triggered as a matter of law.

St. Paul next argues that it has no duty to defend CACI because all the alleged abuse and misconduct occurred in Iraq, which falls outside of the coverage territory of the insurance policy.  CACI disputes this proposition, asserting that the terms of the policy are sufficiently capacious to encompass its activities in Iraq.  Furthermore, CACI argues that the <u>Saleh</u> complaint alleges negligent hiring and supervision against the corporation, and that such alleged negligence presumably occurred within the United States.

Lastly, St. Paul contests whether CACI Premier is even a covered subsidiary under the policy,[4] and whether CACI provided timely notice to St. Paul of its potential liability for its operations in Iraq.

There is no need to resolve each of these disagreements because the issue of geographic scope, that is whether CACI's alleged conduct falls within the coverage territory of the policy, is dispositive for purposes of summary judgment.

I.   Scope of Coverage

The Eight Corners Rule first directs the Court to construe

---

[4] CACI Premier was not a named subsidiary in the policy. Under the terms of the policy, unnamed subsidiaries are protected only if CACI "own[ed] more that 50% of it on the beginning date of [the policy]."  Commercial General Liability Protection, at 8, Policy No. TE09001851, March 31, 2003.

the terms of the insurance policy relating to the scope of
coverage.   Traditional rules of contract interpretation are used
to determine the meaning of the terms of an insurance policy.
Unambiguous provisions are to be given their plain and ordinary
meaning.  See Gov't Employees Ins. Co. v. Moore, 580 S.E.2d 823,
828 (Va. 2003).   However, ambiguous provisions should be
"construe[d] in favor of coverage or indemnity and against a
limitation of coverage."  United Servs. Auto Ass'n v. Webb, 369
S.E.2d 196, 198 (Va. 1989).

        Under the terms of the policy, St. Paul agreed to make
payments "only for covered injury or damage that's caused by
events that happen, or offenses that are committed" in the
"coverage territory."  Commercial General Liability Protection,
at 6, Policy No. TE09002030, March 31, 2004.  The "coverage
territory" is defined as the United States, including its
territories and possessions, Puerto Rico, Canada, and
"international waters and airspace only during travel or
transportation between any of the above places."  Id. at 7.  St.
Paul also agreed to

        apply, and make payments under, this agreement for
        covered injury or damage that's caused by events which
        happen, or offenses which are committed, in the rest of
        the world if . . . the events or offenses result from
        the activities of a person whose home is in the
        coverage territory, but is away from there for a short

time on your business . . . .[5]

Id. at 6.  CACI argues that this "short time" exception obligates
St. Paul to defend it in the litigation before Judge Robertson.

Under the plain and ordinary meaning of this provision,
coverage for injuries caused by events that happen or offenses
committed outside of the coverage territory is excluded unless
three conditions are satisfied: (1) the employee resides in the
coverage territory; (2) his absence from the coverage territory
is for "a short time"; and (3) he is acting within the scope of
his employment or agency with the insured during the absence.

Although the phrase "a short time" does not fix a precise
upper boundary for the length of time that an employee may be
away from the coverage territory, the ordinary meaning of the
adjective "short" is well established; it means "lasting a brief
time." American Heritage College Dictionary 1260 (3d ed. 2000).

The phrase "a short time" must also be read in the context
of the entire policy.  Cf. Resource Bankshares Corp. v. St. Paul
Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005) ("As with
other contracts, when interpreting a policy courts must not . . .
examine certain specific words or provisions in a vacuum, apart
from the policy as a whole.").  Given the twelve-month duration

---

[5] The "coverage territory" provisions of the March 31, 2003
Policy are identical in all material respects.  See Commercial
General Liability Protection, at 5, Policy No. TE09001851, March
31, 2003.

of the policy, characterizing a multi-month overseas deployment as "a short time" away from the coverage territory would strain the ordinary meaning of "a short time."  Rather, it is clear that this provision extends coverage only to brief business trips where the employee's permanent work site or duty station remains inside the coverage territory.[6]

Having clarified the terms of the insurance policy, the Court must next discern whether any of the allegations in the Saleh and Ibrahim complaints potentially come within the coverage territory.

II.  Allegations of Misconduct by CACI Interrogators

CACI argues the Saleh and Ibrahim complaints are silent as to the length of time that the CACI interrogators were allegedly in Iraq.  CACI contends that because there is an open possibility that its interrogators were in Iraq for "a short time," St. Paul

---

[6] It is important to note that, when CACI purchased and renewed the policy at issue in this litigation, it also purchased a separate policy from St. Paul to cover injuries or damage caused by CACI's activities outside of the United States and Canada.  See Morse Decl., Exhibit E (Letter from David Ovadia to Donald King, Nov. 3, 2004, at 8) (stating that, under Global Contract TE09001475, St. Paul agreed to "defend claims and suits, and pay judgments, settlements, and medical cost or expense anywhere in the world except for the prohibited area") (emphasis added).  Because Iraq was identified as part of the "prohibited area," no coverage is available under that policy for the allegations in the Saleh and Ibrahim complaints.  Id.  CACI's decision to purchase a separate policy for its activities outside of the United States and Canada is compelling evidence that the parties intended a purely domestic scope for the instant policy.

is obligated to defend it in the underlying lawsuits.  In
response, St. Paul references CACI's contracts with the United
States government to demonstrate that CACI interrogators were
deployed to Iraq for an extended duration, well beyond any
reasonable definition of the "short time" period contemplated in
the insurance policy.  In arguing their positions, the parties
vigorously dispute the quantum of evidence that the Court should
consider under the Eight Corners Rule.

When applying the Eight Corners Rule, Virginia courts look
only to the allegations in the complaint to discern whether the
insurer has a duty to defend under the policy.  See Reisen v.
Aetna Life & Cas. Co., 302 S.E.2d 529, 531 (Va. 1993).  Evidence
outside of that initial pleading cannot be considered.[7]  See
Capital Envtl. Servs., 536 F. Supp.2d at 642.  Given this rule,
it is necessary to identify just what evidence is "intrinsic" to
the Saleh and Ibrahim complaints.

There is a dearth of authority on what constitutes
"intrinsic" evidence for purposes of the Eight Corners Rule.

_____

[7] The rationale behind the rule is evident.  It provides an
orderly and objective inquiry for determining whether the insurer
has a duty to defend, thereby reducing the risk of conflict and
adversarial posturing between the insured and its insurer.
Furthermore, the rule minimizes litigation.  Allowing the insurer
to litigate factual disputes before agreeing to defend its
insured could result in two costly and time-consuming proceedings
for every coverage dispute; the first between the insured and the
insurer, and the second between the insured and the complaining
party.

However, the Eight Corners Rule is a variant of the well-established Four Corners Rule, which is employed to test the legal sufficiency of a complaint at an early stage of litigation. When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6) in federal court or a demurrer in state court, a court must accept the truth of all well-pleaded allegations in the complaint and ignore any extrinsic evidence.

However, in some cases, a document or exhibit outside of the complaint may be "intrinsic" to the complaint.  For instance, a document attached to the complaint is deemed part of that pleading, and may be considered in evaluating a motion to dismiss.   See Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007) ("In reviewing the dismissal of a complaint under Rule 12(b)(6), . . . [w]e may consider documents attached to the complaint . . . .") (citing Fed. R. Civ. P. 10(c)); Flippo v. F & L Land Co., 400 S.E.2d 156, 156 (Va. 1991) ("On demurrer, a court may examine not only the substantive allegations of the pleading attacked but also any accompanying exhibit mentioned in the pleading.").

Furthermore, in federal court, "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.'"  Am. Chiropractic

-13-

Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir.
2004) (alterations and citation omitted).  In a similar vein, a
defendant in Virginia may file a motion craving oyer to admit a
written agreement that was referenced in the underlying
complaint.  The court may then consider that agreement on a
demurrer.  Cf. Ward's Equipment, Inc. v. New Holland North Am.,
Inc., 493 S.E.2d 516, 518 (Va. 1997).

There is no reason not to apply these principles here.  If a
document or exhibit could be considered in evaluating a motion to
dismiss or a demurrer, it can also be considered under the Eight
Corners Rule.  When determining whether an insurer has a duty to
defend its insured in litigation, a court may look to (1) the
allegations in the underlying complaint, (2) any document or
exhibit attached to the complaint, and (3) any document or
exhibit explicitly relied on in the complaint if its authenticity
is not challenged.

Given this approach, the exhibits attached to the Saleh
complaint, which include a job posting for "Team Titan" and a
military report documenting the abuses at Abu Ghraib, are
intrinsic to the complaint and will be considered.[8]  See
Complaint, Exhibits A-D, Al Rawi v. Titan Corp., No. 04-1143

---

[8] CACI did not include these exhibits when it appended a
copy of the Saleh complaint to its Motion for Summary Judgment.
The exhibits are available through the ECF system of the United
States District Court for the Southern District of California.

-14-

(S.D. Cal. June 9, 2004).  CACI's written contracts with the
United States government also constitute appropriate intrinsic
evidence.  Although not attached to the Saleh and Ibrahim
complaints, these contracts are expressly incorporated into the
complaints, and several of the legal claims are predicated on the
contractual relationship created by these documents.  See, e.g,.
Saleh Complaint ¶¶ 48, 53, 57, 81, 289-91; Ibrahim Complaint ¶¶
11, 27, 60, 88-90.  Furthermore, CACI has not challenged their
authenticity, nor could CACI credibly make such a challenge
because it affirmatively offered these contracts as evidence in
support of its motion for summary judgment before Judge
Robertson.  See Motion for Summary Judgment [79], Billings Decl.,
Exhibits 1-3, Saleh v. Titan Corp., No. 05-1165 (D.D.C. Aug. 4,
2006).

     The Saleh and Ibrahim complaints are not, as CACI contends,
completely silent as to the length of time that the CACI
interrogators were in Iraq.  Rather, they allege that CACI
dispatched its personnel to Iraq to perform interrogations and
maintain interrogation facilities for the United States military.
See Ibrahim Complaint ¶ 1 (alleging that plaintiffs "were
unlawfully tortured by agents or employees of the Defendants, who
were under contract with the United States government to provide
security and intelligence services and to maintain facilities for
the incarceration of said detainees"); id. ¶ 11 (alleging that

-15-

CACI "provided interrogation services to the United States government with respect to detainees held in Guantanamo and Iraq"); Saleh Complaint ¶ 86 ("[I]n or around October 2003, five Interrogation Teams . . . were sent to Iraq to set up a 'Gitmo-style' prison at Abu Ghraib."). The complaints further allege that the detainees were confined and abused over the course of multiple months by CACI interrogators. See, e.g., Ibrahim Complaint ¶¶ 34-35, 38-39, 42-43; Saleh Complaint ¶¶ 117-18, 137. These alleged activities, by their very nature, are not indicative of a brief oversees business trip, but rather of a more permanent presence in Iraq.

The exhibits attached to the Saleh complaint further corroborate St. Paul's position. Exhibit A is a job posting for linguistics support positions with Team Titan's "Technical & Operational Support Group" in Baghdad. Team Titan is described as a collaborative effort between CACI and other corporations "to maintain and enhance government owned computer software and provide intelligence analysis support" for the United States military.[9] Id. at 1 (emphasis added). It is difficult to imagine how one could "maintain" software and provide

_____

[9] See also Saleh Complaint ¶ 54 ("Team Titan members (namely, Defendant Titan, CACI Corporate Defendants, and a third entity) were willing to pay above-market rates for interrogation services because they had entered into significant numbers of contracts with various United States agencies, including the United States military, which called for them to provide Interrogation Services.").

-16-

intelligence support with only "short time" employees.   Moreover,
Team Titan required its employees "to work 12-hour shifts and in
excess of 60-hour weeks," "to work as part of a civil-military
team in an unstructured environment," and to "live and work in a
harsh environment."   Id. at 4-5.   This job posting is compelling
evidence that those CACI employees with Team Titan were not
dispatched to Iraq for "a short time."

Exhibit D is a report from the Article 15-6 Investigation of
the 800th Military Police Brigade.   The report identifies two
CACI employees as having direct responsibility for the abuses at
Abu Ghraib and concludes that one employee improperly instructed
military personnel to engage in improper interrogation
techniques:

- "Mr. Steven Stephanowicz, Contract US Civilian
  Interrogator, CACI, 205th Military Intelligence
  Brigade, . . . [a]llowed and/or instructed MPs,
  who were not trained in interrogation techniques,
  to facilitate interrogations by 'setting
  conditions' which were neither authorized and in
  accordance with applicable regulations/policy.   He
  clearly knew his instructions equated to physical
  abuse."   Id. at 48.

- "Specifically, I suspect that COL Thomas M.
  Pappas, LTC Steve L. Jordan, Mr. Steven
  Stephanowicz, and Mr. John Israel where either
  directly or indirectly responsible for the abuses
  at Abu Ghraib (BCCF) and strongly recommend
  immediate disciplinary action . . . ."[10]   Id.

Given the reportedly high level of involvement of these two CACI

---

[10] The report identifies John Israel as a CACI interpreter.

employees in the alleged abuse, and the time span over which such abuse is alleged to have occurred, it is not reasonable to conclude that these two CACI employees were in Iraq for "a short time."

Most significantly, the responsibilities of the CACI interrogation personnel were definitively outlined in CACI's contracts with the United States government.[11] On August 14, 2003, CACI entered into a $13.8 million contract to "provid[e] the Assistant Chief of Staff (ACofS), C2, [Combined Joint Task Force-Seven] with interrogation operations support." CACI agreed to provide "Interrogation Support Cells, as directed by military authority, throughout the [Combined Joint Task Force-Seven Area of Responsibility] to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander."

Under this contract, CACI agreed to provide the following personnel: one coordinator, one theater interrogation support cell (minimum 10 interrogators, six screeners, and six research clerks), and three division interrogation support cells (minimum four interrogators, six screeners, and two research clerks per cell). The support cells were expected to operate 24 hours per day, seven days per week. Each position required a security

---

[11] St. Paul appended copies of the contracts as Exhibits 3 and 4 to its Cross Motion for Summary Judgment and Response in Opposition to CACI's Motion for Summary Judgment.

clearance and demanded a six or seven day work week, with 12-hour shifts each day.  Before deployment, personnel had to secure appropriate documentation, visas, immunization shots, and readiness training.

The contract's period of performance was listed as August 1, 2003 to July 31, 2004, with an option for renewal.  The place of performance was designated as follows: "The government intends the contractor personnel to perform from the offices of the [Combined Joint Task Force-Seven] Iraq and designated interrogation facilities."[12]

On December 3, 2003, CACI entered into a separate $21.8 million contract to assist the Combined Joint Task Force-Seven "in performance of HUMINT and Counterintelligence (CI) missions at secure and fixed locations."  The HUMINT Support Teams would

> conduct missions such as debriefing of personnel, intelligence liaison with installation units/personnel, support to OPSEC/SAEDA awareness programs, CI/security assessments, screening of locally employed persons (LEP screening), initial handling of walk-ins, CI support to force protection, intelligence report writing/quality control, and screening/interrogation of detainees at established holding areas.

As part of this contract, CACI agreed to provide three CI/HUMINT advisors to coordinate screening and interrogation

---

[12] In exchange, the government agreed to provide "Billeting/Quarters, Message Facilities, Post/Base Exchange, Banking, Check Cashing, Currency Exchange, Theater, Laundry, Gymnasium, Army/Air Force Postal Services, Morale Welfare and Recreation Services, and full care Medical/Dental Services as applicable to local theater regulations and policies."

operations.  CACI additionally agreed to furnish 15 senior
counterintelligence agents, 30 junior counterintelligence agents,
and 30 junior interrogators, all of whom had to have knowledge of
military interrogation procedures.  The positions required 12-
hour shifts and six-day work weeks.

This second contract contained the same performance
parameters as the first contract.  CACI agreed to a one-year
period of performance, from November 1, 2003 to October 31, 2004,
with an option for renewal.  The offices of the Combined Joint
Task Force-Seven in Baghdad, along with subordinate divisional
offices, were designated as the place of performance.

Given the one-year period of performance, the extensive job
requirements and responsibilities, the mandate that these
personnel obtain top level security clearances, numerous
documents, and readiness training before arriving in the theater,
and the military's provision of living quarters, personal
amenities, and medical services, CACI's suggestion that its
interrogators might have been sent to Iraq for "a short time" is
not credible.[13]  They were not there for a business trip or a

---

[13] It is also important to note the nature of the dynamic
between interrogators and their subjects.  The relationship "is
largely dependent upon creating an atmosphere of dependency and
trust between the subject and interrogator.  Developing the kind
of relationship of trust and dependency necessary for effective
interrogations is a process that can take a significant amount of
time."  Jacoby Decl. at 4, in Padilla v. Rumsfeld, 243 F. Supp.2d
42 (S.D.N.Y. 2003).  CACI's suggestion that the military would
hire a group of civilian contract interrogators for "a short

temporary job assignment.  The government requested, and CACI provided, a corps of contract interrogators to live and work in Iraq for an extended time period.

On this record, all the evidence intrinsic to the two complaints and reasonable inferences therein support St. Paul's position that CACI's interrogators were not deployed to Iraq for "a short time."  Because these employees were outside of the coverage territory of CACI's insurance policy, St. Paul has no duty to defend CACI against the allegations in the Saleh and Ibrahim complaints.

III. Allegations of Negligent Hiring and Supervision

Lastly, CACI contends that, even if the policy excludes coverage for the activities of CACI's interrogators in Iraq, the policy requires St. Paul to defend it because the Saleh complaint alleges that CACI was negligent in hiring and supervising its interrogators in Iraq.  This argument is not persuasive.

The intent of the parties in drafting the territorial limitations of the policy is unmistakable.  Except in limited circumstances, St. Paul has expressly disavowed any duty to defend or indemnify CACI for "injury . . . that's caused by events which happen, or offenses which are committed, in the rest

---

time" is therefore implausible.

of the world."[14]  This territorial exclusion applies with equal
force to claims of supervisory negligence, as the factual
predicate for such claims arises from the underlying tortious
conduct of the employee.  If the underlying conduct of the
employee - in this case, the alleged abuse and torture of
detainees in Iraq - occurred outside of the coverage area, then
there is no coverage under the plain language of the policy.[15]

---

[14] As discussed above, CACI deliberately purchased a
separate insurance policy from St. Paul to cover injuries or
damage caused by CACI's activities outside of the United States
and Canada.  However, that policy expressly excluded Iraq from
its coverage territory.

[15] To hold otherwise would allow an insured entity to
knowingly dispatch its employees to any corner of the globe and
then, regardless of territorial restrictions in its insurance
policy, claim a general duty to defend so long as the underlying
complaint alleges negligent hiring or supervision against the
entity.

<u>Conclusion</u>

Given the allegations in the <u>Saleh</u> and <u>Ibrahim</u> complaints, the clear language of CACI's contracts with the United States government, and the territorial coverage limits of the policy, it is clear that St. Paul has neither a duty to defend nor indemnify CACI. Accordingly, CACI's Motion for Summary Judgment will be DENIED and St. Paul's Motion for Summary Judgment will be GRANTED.[16]

A separate order consistent with this Memorandum Opinion will be entered.

Entered this _14_ day of July, 2008.

Alexandria, Virginia

_/s/_

Leonie M. Brinkema
United States District Judge

---

[16] Because this holding moots CACI's Motion to Dismiss or Stay Defendant's Counterclaim Relating to the Duty to Indemnify, that motion will be denied.

-23-